# The Coastal Club, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 94770. Filed March 17, 1965.

*Lee I. Park,* for the petitioner.
*James D. Webb III,* for the respondent.

The respondent determined deficiencies in income tax against the petitioner for its fiscal years ended March 31, 1957 through 1960, in the respective amounts of $143,464.26, $54,020.40, $40,039.28, and $6,989.87.

The questions presented are (1) whether for the taxable years petitioner was a recreational club entitled to exemption from tax under section 501(c)(7) of the Internal Revenue Code of 1954; and (2) alternatively, whether the respondent abused his discretion in revoking his prior ruling that petitioner was exempt.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found as stipulated.

The petitioner is a corporation organized June 27, 1928, under the nontrading corporation laws of the State of Louisiana. It filed exempt organization information returns, Form 990, for its fiscal years ended March 31, 1957 through 1960, with the district director of internal revenue at New Orleans, La.

The petitioner was organized primarily as a duck-hunting club. In its articles of incorporation its purposes are stated as follows:

The objects and purposes for which this corporation is formed are hereby declared to be the acquisition and maintenance of a game and fish preserve and hunting and fishing grounds in the State of Louisiana; to promote skill in marksmanship and gun practice; to afford recreation and opportunity for hunting and fishing and the exercise of athletic and outdoor sports to its members

and guests; to conserve game and fish; to afford opportunities for social entertainment to its members and guests; to acquire or erect clubs or club houses, outhouses, boat houses, garages, wharves, stables, cafes, refreshment rooms, and to acquire, own, and use all other equipment necesary or incidental to the carrying out of the said objects and purposes.

Membership in the petitioner has at all times been limited to 100 persons. During the taxable years involved herein, the petitioner had 99 members, each owning 1 share of its stock. With the possible exception of 1 of the 99 shares the outstanding shares were owned by individuals or estates of individuals. The one hundredth share was held by petitioner as treasury stock.

It is provided in the petitioner's articles of incorporation that a shareholder desiring to sell his stock to anyone other than certain close male relatives must grant to the petitioner a right of first refusal. The shareholder is required to give written notice to the petitioner of his intent to sell, together with the identity of the prospective purchaser and the proposed sale price. The petitioner may then either approve the sale or elect to purchase the share at its book value, as reflected by the petitioner's most recent annual financial statement. In the event the petitioner elects to purchase the stock, the shareholder may withdraw his proposal to sell within a 10-day period.

Upon its organization in 1928, the petitioner acquired approximately 6,000 acres of land, with a clubhouse thereon, in Cameron Parish, La. The same land and clubhouse have continued to be used by the petitioner for its duck-hunting activities to the present time. The petitioner's property is adjoined on its southern boundary by a canal known as the Intracoastal Canal, which is used extensively for commercial shipping. Other canals adjoin the property on its western boundary and a portion of its eastern boundary.

The property is primarily marshland which is covered with water a great deal of the time. The water is generally fresh water, while the Intracoastal Canal at times contains brackish water. Plants which are grown for duck food in a fresh water marsh will not grow successfully in a brackish water marsh. Levees along the canal bordering the petitioner's property keep the fresh water in the marsh and the brackish water out.

Since sometime prior to 1945, the petitioner has annually obtained from Miami Corp., a land-holding corporation, the right to hunt on approximately 6,400 acres of land owned by that corporation and situated to the south and west of the petitioner's property, on the opposite side of the Intracoastal Canal. During each of the years in issue, the petitioner paid Miami Corp. $500 for that right. The petitioner's rights over the Miami Corp. property have extended only during the

hunting seasons and have been expressly subordinated to the rights of a certain lessee engaged in trapping fur-bearing animals and to any oil, gas, or mineral leases covering the land. In order to prevent poaching by others on the Miami land, the petitioner had the property surveyed and the boundary lines marked with concrete markers and flags, at a cost of $2,985, during its fiscal year ended March 31, 1959. The petitioner on occasion has attempted to secure a long-term lease from Miami Corp. on the property, but has been unsuccessful.

The petitioner's clubhouse is a two-story wooden structure. A dining room, kitchen, general assembly room, three private bedrooms, and a large dormitory containing 10 bunks are on the upper level. On the lower level there are sleeping quarters for guides and indoor parking spaces for several automobiles. Water for the clubhouse is supplied by a deep well and water tower behind the building. Cooks and waiters are employed on a regular basis during the duck-hunting season.

A house for the caretaker employed by the petitioner is also located on the property, as are several small outbuildings, including a boathouse, a pumphouse, and boatsheds. The caretaker lives on the premises during the entire year.

The petitioner's members hunt ducks of various types and other waterfowl during the duck-hunting season, which usually begins late in November and ends early in January. Approximately 73 to 75 members actually hunt each year. Hunting dates are allocated annually by the petitioner's secretary among the active hunting members, each being allowed approximately 5 days which he may use in any combination. Guests are allowed to hunt at the club, if accompanied by a member, but the member uses up one of his allotted hunting dates for each guest he brings. Formerly, 10 hunting blinds were used, in which the members hunted individually, but beginning with the 1962 hunting season 6 blinds have been used, with two hunters to a blind. Access to the blinds is by boat over the water trails on the petitioner's property, and the petitioner maintains several boats for that purpose.

Since prior to 1936, the members of the petitioner have paid annual dues of $50 each, plus excise tax thereon. The petitioner's president, secretary, and attorney are excused from paying the annual dues. The secretary also receives a salary but none of the other directors or officers receive any compensation. For each day of hunting, the members pay a fee of $9.50, which includes meals, lodging, and the services of a guide. The petitioner's facilities have never been made available to the public.

Some of the petitioner's members have gone fishing on the petitioner's property, primarily in the spring and at other times outside

of the duck-hunting season, but such activity has been inconsequential. Members using the petitioner's facilities outside of the duck-hunting season must make their own arrangements with the caretaker for meals, guides, and other accommodations.

On April 11, 1935, the petitioner executed an oil and gas lease covering its entire 6,000 acres to one Walter C. Peters, who shortly thereafter assigned the lease to Shell Petroleum Corp. (later known as Shell Oil Co. and hereinafter referred to as Shell). This lease (hereinafter sometimes referred to as the 1935 lease) was for a term of 5 years (called the primary term) and for as long thereafter as oil, gas, or other minerals were produced from the land. It provided for the payment of a consideration or bonus of $3,000 to the petitioner, annual delay rentals (payments for the privilege of deferring drilling) of $6,000, and a royalty of one-eighth of the oil and gas produced. Prior to the completion of any wells on the property, the petitioner received the $3,000 bonus and also received delay rentals of $6,000 in each of its fiscal years ended March 31, 1937 through 1940, a total of $27,000.

In June 1936, the respondent ruled that the petitioner was required to file a Federal income tax return for its fiscal year ended March 31, 1936, although it had been ruled exempt from income taxes for years prior thereto. Pursuant to the ruling, the petitioner filed income tax returns and paid the taxes reflected thereon for its fiscal years ended March 31, 1936 through 1940, and filed capital stock tax returns and paid the taxes reflected thereon for the taxable periods ended June 30, 1935, through June 30, 1940.

The petitioner filed claims for refund of the income and capital stock taxes paid, on the ground that it was an exempt social club, but the claims were rejected by the respondent. In April 1940, in response to a request by the petitioner that its claims for refund be reconsidered in view of the decision in *Koon Kreek Klub* v. *Thomas*, 108 F. 2d 616 (C.A. 5, 1939), the respondent reaffirmed his ruling that the petitioner was not exempt from Federal income taxes.

On February 4, 1941, the petitioner filed suit against the United States in the U.S. District Court for the Western District of Louisiana, seeking a refund of the Federal income taxes paid by it for the fiscal years ended March 31, 1937 through 1940, and the capital stock taxes paid for the periods ended June 30, 1939, and June 30, 1940.

After the refund suit was at issue, the U.S. attorney, in a letter to the petitioner's attorney dated November 21, 1941, suggested that further action be withheld pending a decision by the Court of Appeals

for the Fifth Circuit in the case of *Scofield* v. *Corpus Christi Golf and Country Club*, which was then on appeal to that court. In the letter it was stated that the *Corpus Christi* case involved "issues identical to those involved" in the petitioner's case and that the decision in that case would determine the policy of the Department of Justice in the petitioner's case and would in all probability make a trial of the petitioner's case unnecessary.

The Court of Appeals held in *Scofield* v. *Corpus Christi Golf and Country Club*, 127 F. 2d 452 (C.A. 5, 1942), that the club involved therein was exempt from Federal income taxes. In a letter dated April 25, 1942, from the U.S. attorney to the petitioner's attorney, the following was stated:

The opinion of the court is rather definite on the points decided and seems to govern the issues presented in our case, provided of course the evidence you have is of the same nature as that in the Corpus Christi case.

Shortly thereafter, the petitioner received a full administrative refund of the taxes which were the subject of the refund suit,[1] with interest thereon, and the suit was dismissed with prejudice.

In June 1940, Shell completed the drilling of a producing oil well, known as Coastal Club No. 1, and in May 1941 it completed the drilling of a producing gas well, known as Coastal Club No. 2. Both wells were located within an area known as the Chalkley Field, the southern portion of which encompassed the northern part of the petitioner's property. The gas well has continued to the present time to produce gas in paying quantities, but the oil well went dry at an undisclosed time.

On March 12, 1942, the petitioner filed suit against Shell in the U.S. District Court for the Western District of Louisiana, seeking a cancellation of the 1935 lease. The petitioner claimed: (1) That Shell had breached the lease by failing to adequately develop the premises despite repeated demands, and (2) that Shell had further abandoned and terminated the lease by executing and placing of record two partial releases, the first purporting to release from the force and effect of the lease all of the property except 240 acres surrounding the two producing wells, and the second further releasing all but 80 acres. Extensive litigation ensued until the case was finally settled by agreement, as hereinafter set forth.

---

[1] It has been stipulated that income taxes for the fiscal years ended Mar. 31, 1941 and 1942, and capital stock taxes for the periods ended June 30, 1941, and June 30, 1942, were also paid and that claims for refund were filed therefor. Those taxes were not made a subject of a refund suit. The record does not indicate the exact disposition of those refund claims but does indicate that the petitioner received $1,388.43 from a "Tax refund" during its fiscal year ended Mar. 31, 1945.

The petitioner's receipts and disbursements for its fiscal years ended March 31, 1936 through 1943, were as follows:

| Fiscal year ended Mar. 31— | Receipts | | | | | | Disbursements |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Dues | Service charges and guest charges [1] | Total dues, service charges, and guest charges | From oil and gas leases | Interest and miscellaneous | Total | |
| 1936 | $4,650 | $1,765.56 | $6,415.56 | [2] $3,000.00 | 0 | $9,415.56 | $4,959.43 |
| 1937 | 4,500 | 2,057.32 | 6,557.32 | 6,000.00 | 0 | 12,557.32 | 5,224.78 |
| 1938 | 4,500 | 2,462.16 | 6,962.16 | 6,000.00 | $100.00 | 13,062.16 | 9,151.89 |
| 1939 | 4,500 | 3,665.03 | 8,165.03 | 6,000.00 | 0 | 14,165.03 | 6,702.54 |
| 1940 | 4,500 | 2,605.93 | 7,105.93 | 6,000.00 | 0 | 13,105.93 | 7,026.11 |
| 1941 | 4,500 | 3,288.70 | 7,788.70 | 1,604.07 | 300.00 | 9,692.77 | 8,069.05 |
| 1942 | 4,500 | 3,749.52 | 8,249.52 | 10,677.05 | 200.00 | 19,126.57 | 7,684.34 |
| 1943 | 4,450 | 4,685.60 | 9,135.60 | 8,729.47 | [3] 3,498.69 | 21,363.76 | [4] 10,356.89 |

[1] The extent to which these charges covered the expenses for the services provided is not readily determinable from the record.
[2] As reported on the Federal income tax return filed by the petitioner for the fiscal year ended Mar. 31, 1936. This amount represents the bonus received from Shell pursuant to the 1935 lease. It is not clear from the record whether the amount was actually received during that year or immediately prior thereto.
[3] Includes tax refund of $3,111.19, for taxes which were the subject of the refund suit and interest thereon.
[4] Includes legal fees of $1,250.47 for tax refund suit and $2,527.87 for suit against Shell.

On or about May 6, 1943, the petitioner filed the respondent's form for organizations claiming exemption from Federal income tax as social clubs, Form 1025, with the collector of internal revenue at New Orleans, La. In the form as filed, the petitioner stated that the purposes for which it was formed were: "Social Club, hunting and fishing. Principally duck hunting"; that it had issued 100 shares of stock for $12,000; and that the sources of its income were "Annual Dues from members, Service charges to members and their guests, Oil and Gas royalties, and interest from U.S. Government bonds." It was further stated as follows:

Eighty acres of land is covered by an Oil, Gas and Mineral Lease, executed April 11, 1935. Lease originally covered all the land owned by the corporation but remainder has been released. Amount realized from said lease up to and including March, 1943, was $48,010.59.

Attached to the form were copies of the 1935 lease, the petitioner's articles of incorporation, bylaws, and financial statements for the fiscal year ended March 31, 1943. In the balance sheet so attached, the assets listed included cash in bank of $14,373.39, U.S. Government bonds of $25,000, and treasury stock (two shares) listed at a total of $1,000. The balance sheet also showed a net surplus from "Dues, Guest Fees, Interest, Royalties" of $58,900.98. The statement of income and expenses correctly stated the petitioner's receipts and disbursements for the fiscal year ended March 31, 1943, as set forth hereinabove.

On July 17, 1943, the respondent ruled that the petitioner was exempt from Federal income taxes under section 101(9) of the Internal Revenue Code of 1939, and that accordingly the petitioner would not be required to file income tax returns unless it changed the

character of its organization, the purpose for which it was organized, or its method of operation. Since the issuance of the ruling, the petitioner has filed information returns, Form 990, as a corporation exempt from income taxes.

In February 1945, the petitioner's suit against Shell was settled by an agreement whereby Shell paid the petitioner $5,000 and 5,640 acres of the petitioner's property were released from the force and effect of the 1935 lease, Shell retaining its rights under the lease to 360 acres surrounding the two producing wells. The total expense to the petitioner for attorney's fees and other litigation costs with respect to the suit against Shell was $5,573.90.

In April 1945, the petitioner entered into an oil and gas lease covering the aforesaid 5,640 acres of property with one John J. Doyle, who shortly thereafter assigned the lease to Stanolind Oil & Gas Co. The lease was for a primary term of 5 years and provided for the payment of a bonus of $5,640, an annual delay rental of $5,640, and a royalty of one-eighth of the oil and gas produced. The petitioner received the bonus of $5,640 and delay rental for 1 year, $5,640, a total of $11,280, during its fiscal year ended March 31, 1946. On April 10, 1947, Stanolind released and relinquished its rights under the lease.

On May 5, 1947, the petitioner entered into an oil and gas lease covering 1,710 acres of its land with Sohio Petroleum Co. The lease was for a primary term of 5 years and 5 months, and provided for the payment of a bonus of $1,710, an annual delay rental at the rate of $25 per acre, and a royalty of one-eighth of the oil and gas produced. On August 21, 1947, Sohio, exercising a right it possessed under the lease, selected 1,070 acres to be retained subject to the lease and released the balance of the property from the terms of the lease. The petitioner received the bonus of $1,710 and delay rental of $5,350, a total of $7,060, during the fiscal year ended March 31, 1948. On October 5, 1948, Sohio released its rights under the lease to the remaining 1,070 acres.

Following the October 5, 1948, release by Sohio, if not before, petitioner made complaints to Shell that its land was being drained of gas by certain of Shell's wells. Shell was also receiving similar complaints from adjoining landowners who were likewise lessors of Shell. In the area under complaint there were four gas-producing sands. On petitioner's land there was production from only one sand whereas on other tracts in question there was production from one or more of the other of the four sands. These lessors, including petitioner, pressed Shell for further development in their particular areas.

On February 28, 1952, petitioner and Shell, with Shell acting through an agent, entered into an oil and gas lease, sometimes referred to as the 1952 lease, covering 1,800 acres of petitioner's land which adjoined the 360 acres still held by Shell under the 1935 lease.

The 1952 lease was for a primary term of 5 years and provided for a cash bonus of $18,000, an annual delay rental of $18,000, and a royalty of one-eighth of the oil and gas produced. The lease contained provisions extending the primary term if at the end thereof oil or gas was being produced, or if a well in process of being drilled, until the well was completed, and if a producer, during production. If the well being drilled turned out to be a dry hole, the lease would terminate unless steps were taken within a specified period to rework the well.

The lease recited that the—

Lessee is cognizant of the fact that the lands herein leased are a part of a hunting and game preserve for water fowl, and that water standing thereon must be continually retained on said lands. Where Lessee shall dredge canals, ditches or other excavations on the lands herein leased or as contiguous, adjacent or bordering land, capable of draining the lands herein leased, such excavations shall be protected by Lessee by the erection of levees or other works in such a manner as will effectively prevent such drainage. Any acts of omission or commission under this provision shall be a cause for cancellation or termination of this lease under its terms; provided, however, that Lessor shall not be relieved of giving notice of default in accordance with Section 14 hereof.

One of the factors inducing Shell to seek the 1952 lease was its concern lest some third party under a lease from petitioner obtain production on the adjoining property and drain gas away from the producing well on the 360 acres held under the 1935 lease. Another factor, which could have been the much weightier of the two, was that Shell was obligated by a contract whereunder it was receiving a very low price for the production from the existing well. Production from a well or wells on the land covered by the new lease would not be subject to the existing gas sales contract.

Following the execution of the 1952 lease petitioner continued to complain to Shell that its property was being drained of gas by other of Shell's wells and to press Shell for further development of its leased property. Other lessors of Shell to the north also continued to press Shell for action relating to their properties. Recognizing that there was justification for the complaints, Shell suggested an agreement under which the production from the affected properties would be unitized and allocated between the properties covered by the agreement.

A proposed agreement dated September 1, 1954, was worked out covering the 360 acres of Coastal Club land held by Shell under the 1935 lease and 220 of the 1,800 acres covered by the 1952 lease and designated areas belonging to three others of Shell's lessors. The unitization was to be limited to the gas and condensate production from four specified sands or horizons and the allocation among the lessors would be based on estimated gas reserves underlying the respective tracts at the horizons designated. Under the proposed agree-

ment 12.53 percent of the total production from the unit was allocated to petitioner's 360-acre tract and 3.97 to the 220-acre tract.

The three lessors other than petitioner agreed to and signed the unitization agreement sometime in September of 1954. Petitioner, on the other hand, did not sign but continued to negotiate certain matters with Shell. Among other steps taken it employed a geologist to make a study of potential production from that portion of the Coastal Club property which would be covered by the agreement, for which services its board of directors in March of 1955 approved payment of not to exceed $2,500.

It was agreed between Shell and petitioner that the proposed unitization agreement required some changes in the 1952 lease. Such differences as they had were resolved, and in May of 1955, contemporaneously with their signing of the unitization agreement, they executed a supplemental agreement whereby Shell "as further consideration" agreed to pay petitioner under the 1952 lease "an additional 1/16 of 8/8 royalty computed on Coastal's share in the production from the unit until the time that Coastal will have received from the payment of such additional royalty the sum of $100,000, at which time this obligation will cease." It was also recited that the unitization agreement upon being executed by Shell was to be effective as of September 1, 1954.

Aside from and in addition to any royalty payments received by petitioner under the above supplemental agreement, petitioner, pursuant to the 1952 lease, received the $18,000 cash bonus during its fiscal year ended March 31, 1952, and the annual delay rental of $18,000 in each of its fiscal years ended March 31, 1952 through 1956, for a total of $90,000.

On December 20, 1956, Shell entered into an oil and gas lease with a company known as Little Lake Misere Land Co. for a primary term of 3 years. This lease covered 1,100 acres of land adjacent to and south of a portion of the 1,800 acres of petitioner's property covered by the 1952 lease.

Under date of January 4, 1957, Shell's vice president for its New Orleans area requested authorization from the New York office for the drilling of a well on petitioner's property to the depth of 16,500 feet at a site within the 1,800 acres covered by the 1952 lease. In making the request the opinion was expressed that the acreage held under that lease had "prospects for a very rich gas accumulation." Further, it was pointed out that the lease in the absence of drilling or production would expire February 27, 1957, and that the drilling of the proposed well would extend the lease beyond the primary term. The geophysical information of the area was reviewed, on the basis of which it was stated that there was a possibility of discovery of a "large gas reserve" similar to the very rich reserve previously discovered at

Lake Arthur approximately 17 miles northeast of petitioner's property. It was estimated that the cost of drilling a completed well would be $950,000, but if the well should be a dry hole the cost was estimated at $834,000. It was noted that the existing lease was offset by open acreage belonging to Coastal Club and, on the east, by leases held by Frankfort Oil Co. The letter advised that an attempt would be made to acquire a lease on the open acreage and to form a joint arrangement with Frankfort for the drilling of the well. Request was also made for authority to drill the well for Shell's account without the help of others, if necessary, "in order * * * to protect Shell's large and promising lease." Under date of January 25, 1957, Shell's production department in New York authorized the expenditure of up to $950,000 for the drilling of the proposed well.

Shell, acting through a lease brokerage firm, and petitioner, through a committee appointed by its board of directors on January 23, 1957, entered into negotiations for the new lease which was to cover the entire 5,640 acres of petitioner's land not already covered by the 1935 lease. On February 11, 1957, Shell and Coastal Club entered into an agreement for an extension of the 1952 lease pending the outcome of the negotiations. In the February 11 agreement it was recited that Shell was desirous of obtaining an oil, gas, and mineral lease to cover the 5,640 acres of petitioner's property and that it had offered as a bonus therefor $384,000, a renewal rental of $50 per acre per year, and a one-sixth royalty on oil, gas, and other minerals produced for a primary term of 3 years. For and in consideration of $10,000 paid by Shell the parties by the agreement of February 11 extended the term of the 1952 lease from February 27, 1957, until Shell had received written notice from petitioner that the negotiations relative to changes in the existing lease had reached an impasse and for a period of 30 days thereafter, or in the event that no such written notice was received by Shell, the primary term of the 1952 lease would be extended for 120 days. There was a further provision that in the event of the execution of a new lease the $10,000 should be credited against the $384,000 lease bonus.

On February 12, 1957, petitioner's president sent letters to each of Coastal's board members reporting the developments including the execution of the extension agreement with Shell. His letter included the following:

The purpose of this letter is to call your attention to the Club's future as far as hunting and fishing is concerned if and when our lands are fully developed to produce minerals. It is the general consensus that a distillate or gas field will not interfere with the hunting and fishing as would an oil field; and we should all recognize that the discovery of an oil field would to all practical purposes put an end to hunting and fishing.

The committee today in discussing the need with the undersigned and your secretary feels that it should be empowered to negotiate at once with Miami Corporation or any other land owner in the vicinity in view of getting a lease or an option to lease acreage which would be available in the event our present acreage becomes useless.

A new lease between Shell and petitioner dated March 22, 1957, was agreed upon and executed. This lease was for a primary term of 3 years "and as long thereafter as either (1) oil, gas, sulphur or other mineral is produced from said land by lessee in paying quantities." The lease bonus was fixed at $384,000, the amount originally offered, and the amount of the annual delay rental at $282,000. It was also provided that the lessee should have the right to "lay pipelines, establish, maintain and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig and dredge canals, build tanks, telephone lines, and other structures on said land necessary or useful in lessee's operation in exploring and drilling for and producing minerals therefrom and in treating, storing and transporting minerals produced from this lease or any other lease covering land contiguous to the land" covered in the instant lease. It was further provided that the lessee should have "the exclusive right to build, operate and maintain pits, reservoirs, pickup stations and plants for the purpose of picking up and conserving the waste oil that flows * * * across the land embraced in the lease, whether said oil is produced from land covered by this lease or other lands, and lessor shall be entitled to receive the royalty hereinbefore reserved on all such oil so saved."

The lease also provided that it was to supersede the 1952 lease except as to the designated horizons of the 220 acres covered by the unitization agreement which were to continue to be subject to the 1952 lease, as amended by the supplemental agreement to the unitization agreement.

By a supplemental agreement of the same date, it was agreed that Shell's operations under the lease would be conducted in a manner that would least interfere with the petitioner's hunting and fishing activities; that unless it should otherwise prove unreasonably costly or impractical no operations or a minimum of operations would be conducted during duck-hunting seasons; and that Shell would use all methods customarily used in the industry to prevent pollution of the petitioner's waters with salt water, oil, and other waste. It was further agreed that the spoil from any canals dug by Shell would be scattered in such a way that the spoil bank would not be over 4 feet above the water level of the marsh, ponds, and lakes, and that upon ceasing

to use or abandoning such a canal, Shell would dam the canal at the petitioner's outside property line.

On May 6, 1957, at a special meeting of the petitioner's board of directors, the committee which had negotiated the 1957 Shell lease for the petitioner was authorized: (1) To employ geologists to make a subsurface survey and estimate of the oil, gas, and minerals underlying the petitioner's lands, and (2) to "employ a tax attorney and expert to work with counsel for the corporation to plan a method of distribution of corporate assets which will have, in the opinion of the attorneys, the least tax consequences." Accordingly, a New Orleans firm of consulting geologists was engaged to make the geological survey and the accounting firm of Lybrand, Ross Bros. & Montgomery was engaged to do the tax planning.

After one of its representatives had met with the petitioner's committee, Lybrand, Ross Bros. & Montgomery made a report to the petitioner's board of directors, by a letter dated June 24, 1957, in which it stated the following:

As requested by you, we have considered certain tax problems arising out of certain oil and gas transactions. Our understanding of the facts, and the problems, is set forth below.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The members of the Club are concerned about the effect of the recent lease, and the prospective royalties, on the Club's tax-exempt status. They are also interested in methods of getting the lease bonus, delay rentals, royalties, and other accumulated funds into their own hands.

In the letter, the accounting firm expressed as its opinion that the large lease bonus received from Shell during the fiscal year ended March 31, 1957, "would cause grave doubt to be cast upon the Club's tax-exempt status for that year" but that "it might be possible for the Club to retain tax-exempt status for such year, as well as the current fiscal year, if steps are taken forthwith to dissociate the tax-exempt and taxable activities." The tax effects of a liquidation of the petitioner were discussed in the letter, and it was stated that "consideration might be given" to adopting a plan involving the following steps: (1) The petitioner's members would form a new unincorporated club which would lease the petitioner's property for hunting purposes; (2) the petitioner's land and physical assets would then be transferred to a trustee, to collect the oil and gas income and the rentals from the unincorporated club and distribute the net income to holders of certificates of beneficial interest in the trust; and (3) the petitioner would then be completely liquidated and its cash, investments, and the certificates of beneficial interest would be distributed to the shareholders in redemption of their stock.

In a letter dated July 29, 1957, from the accounting firm to the petitioner's directors, was the following:

In accordance with your request, we have considered the relative tax impacts on the Coastal Club and its members of (1) liquidating the Club, as was discussed in our preliminary report to its Board of Directors, dated June 24, 1957, and (2) doing nothing. As was pointed out in the preliminary report, if the latter course is followed, the Club may well lose its tax exemption for the fiscal year ended March 31, 1957, and all subsequent years; and the discussion below is bottomed on this premise.

The taxes to the petitioner and the shareholders under each of the two alternatives were then discussed.

In a letter dated September 17, 1957, the consulting geologists estimated the fair market value of the petitioner's properties, as of August 1, 1957, to be $618,900. This amount consisted of $54,900 as the discounted value of the petitioner's interest in the future gas and condensate production under the Shell unitization agreement and $564,000 for the 5,640 acres covered by the 1957 lease. Petitioner's net income under the unitization agreement was estimated at $151,300.

In a letter dated September 18, 1957, from the accounting firm to the petitioner's attorney, the following was stated:

As requested by you, we have considered the tax effects of the continued operation on the present basis of The Coastal Club, Inc.

\* \* \* \* \* \* \*

In view of the Club's successful tax suit, we feel that in good faith it can continue to file as an exempt organization (on Form 990) rather than as a taxable corporation (on Form 1120). Under 1954 Code section 6501(g)(2), this Form 990 would start the running of the statute of limitations. Thus, unless the Treasury attempted to assert a tax for the year ended March 31, 1957, on or before August 15, 1960, such year would be forever closed. Moreover, another year would become closed on August 15th of each year thereafter.

It is entirely possible that, if the Club continues operations on the present basis, no question ever will be raised by the Treasury as to the Club's tax-exempt status. Even if the question were raised, the Club might prevail. Assuming the Treasury successfully attacked the Club's tax-exempt status for the fiscal year ended March 31, 1957, the Club probably would remain taxable for all subsequent years.

In the letter, the taxes which would be payable by the petitioner if it were held to be taxable were discussed, and the following was stated:

If the Club amended its Articles of Incorporation so that it could declare dividends, and some members may feel that such should be done because they believe that the Club has more cash and liquid assets than it needs, any amounts so paid would be taxed to the members just as any other dividends. \* \* \*

On or about September 23, 1957, the petitioner sent to each of its shareholders a report reading in part as follows:

The Board of Directors of The Coastal Club, Inc., pursuant to a special call for the purpose, met on the 23rd day of September, 1957. All of the directors

were present. The meeting was called to consider again the tax problems resulting if no action were taken by the Club and no reorganization entered into to divorce the minerals from the lands.

The Committee appointed by the Board, after final consultation with its tax consultants, submitted to the Board the enclosed opinion dated September 18, 1957, which you are now asked to consider. There was also submitted to the Board a preliminary report of fair market evaluation of The Coastal Club properties made by Atwater, Cowan & Associates, Consulting Engineers, a copy of which is enclosed herewith.

Consequently in its closing report to the Board, the Committee submitted to the Board the plan of reorganization and the alternative plan of doing nothing now in the tenable belief that the Club can continue operations on the present basis without having its tax exempt status successfully questioned by the Treasury.

After a thorough consideration of the alternatives, the Board finds:

(a) That the Club was organized for duck hunting and should continue to be a Duck Hunting Club;

(b) That to sever its income producing properties from its duck hunting operations with no absolute assurance that the Treasury will accept the plan of reorganization is inadvisable; that to apply for a Treasury ruling at this time would invite an unjustified attack on its exempt status by the Treasury;

(c) That contrary to any contention that may be made by the Treasury Department, the Courts have ruled in a litigated matter that the Club is a tax exempt organization;

(d) That the Club has filed a Treasury Form 990 annually, thus cutting the Treasury off from claiming taxes on the income for past years;

(e) That there is no assurance of production in the event the Shell Oil Company drills under the provisions of the lease obtained on March 22, 1957;

(f) That continuation of our present course without change does not foreclose consideration of other alternatives in the future.

For the foregoing reasons and many others, the Board of Directors recommends to the stockholders that the present status of the Club be maintained.

It was requested that the shareholders reply within 10 days, stating whether or not they concurred in the board's recommendation. A failure to so reply was to be deemed an assent to have the board act according to its best judgment.

The petitioner received 40 replies from its shareholders, 38 agreeing with the recommendation of the board and 2 disagreeing. No change was made in the petitioner's operations.

In the summer of 1957, petitioner's property was struck by Hurricane Audrey and considerable damage was done. The clubhouse was damaged, some of the outbuildings were blown away, and extensive damage was done to the levees along the canals bordering the petitioner's property. The petitioner was reimbursed by insurance proceeds for the damage to the clubhouse, but the outbuildings were replaced and the levees were repaired at the petitioner's expense. In addition, one of the canals was clogged with storm debris, which was dug out and dragged away by means of boats furnished by the peti-

tioner and labor furnished by a corporation owning the adjoining land.

On November 23, 1957, the petitioner completed and returned to the district director of internal revenue at New Orleans, a questionnaire sent by the district director seeking additional information concerning review of the Form 990 filed by the petitioner for the year ended March 31, 1957.

Due to the magnitude of the estimated cost for the drilling of the well on Coastal's land, as authorized by Shell's New York office under date of January 25, 1957, Shell had sought the participation of Frankfort Oil Co. which, as indicated, had holdings to the east but Frankfort declined. With the extension of the 1952 lease which was followed by the new 1957 lease the deadline which had existed for the drilling of the well was eliminated and Shell continued its geophysical study of the area, including the land covered by the lease with Little Lake Misere Land Co. Based on these further studies, Shell decided not to drill on either of the properties. It allowed its lease from Little Lake Misere Land Co. to terminate on December 20, 1957, for failure to pay the delay rental and by written release dated March 27, 1958, relinquished its rights under the 1957 lease from petitioner.

The total amount received by petitioner pursuant to the 1957 lease was the $384,000 lease bonus received during the fiscal year ended March 31, 1957.

On February 5, 1959, the petitioner entered into an agreement with Pan American Petroleum Corp. (formerly Stanolind Oil Gas Co.) under which, for a consideration of $62,040, it granted to Pan American the right to conduct a geophysical examination of the 5,640 acres of petitioner's unleased land for a period of 6 months, with an option to select land for oil and gas leasing thereafter.

By a separate instrument, also executed February 5, 1959, Pan American agreed to provisions for the preservation of the petitioner's duck-hunting activities and property which were similar to the provisions contained in the supplemental agreement to the 1957 Shell lease. Two weeks later, February 19, 1959, Pan American advised petitioner that in the event it were to dredge a canal from one of the outside canals to a drilling site, "Pan American would expect that the canal to location would be left open to outside navigation during the time from which operations are commenced until the well is completed as a producer or abandoned as a dry hole."

On August 3, 1959, shortly before the end of the 6-month period of the geophysical agreement, Pan American notified the petitioner that it elected not to lease any of petitioner's property.

The initial approach with respect to all of the oil and gas agreements entered into by the petitioner was in each instance made by the other party to the agreement.

The minutes of the annual meeting of the petitioner's shareholders held on May 19, 1959, report the following:

The stockholders discussed the desirability of securing two or three acres of additional land from the Gayle interests and constructing a new club building. The stockholders recommended that the Board of Directors consider such proposition and the directors agreed that a committee should study such improvements and report back to the Board of Directors as soon as possible.

On June 11, 1959, the petitioner purchased the surface rights to approximately 3 acres of land adjacent to the area upon which its present clubhouse stands, for $1,495, from William J. Gayle & Sons.

Referring to a recent examination of petitioner's income tax liability and noting that petitioner did not agree to the adjustments proposed, the petitioner, by letter dated August 6, 1959, from the office of the district director of internal revenue, was advised of a proposed determination that Coastal Club for the fiscal years 1957 and 1958 had been operated for a profit in addition to its recreational functions and that income from outside sources was considered taxable income from transactions entered into for profit, and further, that the income from outside sources had inured to the benefit of the members, to the end that the conditions imposed by section 501(a) of the Internal Revenue Code had not been met. A tabulation of the income referred to with deductions and adjustments for the 2 years appeared as a part of the letter. Petitioner was advised of its right to an informal conference if request was made within 10 days from the date of the letter.

Sometime in 1959, the Soil Conservation Service of the U.S. Department of Agriculture made a survey of the petitioner's property and offered certain suggestions concerning water management and the planting of duck food. Among the recommendations were that the petitioner improve its then-existing floodgates and install waterpumps. The petitioner had been receiving advice from the Soil Conservation Service since 1955 or 1956 and had attempted to control the water level on its property by use of the floodgates alone, without the use of pumps. At a meeting held on November 26, 1959, the petitioner's board of directors authorized the purchase of the equipment and supplies necessary in order to follow the recommendations of the Soil Conservation Service, and those recommendations were thereafter carried out. By means of the levees, floodgates, and pumps, the marshland is kept relatively dry during the spring and summer months to allow planting and growth of millet and other duck food, and the water level is raised in the fall to attract the ducks.

At the meeting held on November 26, 1959, the petitioner's board of directors also discussed the question of repairing the existing clubhouse or building a new clubhouse. It was unanimously agreed that any action be postponed until the annual meeting to be held in March 1960.

On May 23, 1960, the petitioner executed a consent extending to June 30, 1961, the period within which assessment of taxes for the fiscal year ended March 31, 1957, could be made. On May 6, 1961, the petitioner executed further consents extending to September 30, 1961, the period within which assessments of taxes for the fiscal years ended March 31, 1957, and March 31, 1958, could be made.

On June 20, 1961, the exemption ruling issued to the petitioner on July 17, 1943, was revoked by the respondent for the petitioner's fiscal year ended March 31, 1957, and subsequent years.

In his notice of determination of the deficiencies, issued on August 31, 1961, the respondent determined that the petitioner's income during the taxable years from all sources was taxable, and allowed deductions for expenses in an amount equal to the dues, service charges, and guest charges received, and also for severance taxes, percentage depletion, and certain other expenses.

On August 29, 1962, Louis Bernard, an oil and gas lease broker, acting on behalf of a principal, entered into an agreement with Little Lake Misere Land Co. granting him the right to conduct explorations for oil and gas for a period of 6 months on 2,390 acres of property adjacent to the petitioner's property (including the 1,100 acres which the company had previously leased to Shell), with an option to select land for oil and gas leasing thereafter. Bernard paid $6,000 as consideration for the agreement and subsequently paid an additional $6,000 to extend the agreement for an additional 6-month period, to August 28, 1963.

On September 5, 1962, Bernard offered to pay the petitioner $15,000 for a 6-month geophysical option covering the petitioner's 5,640 acres of unleased land. The offer was refused by the petitioner.

On August 26, 1963, Bernard, exercising the option under his agreement with Little Lake Misere Land Co., elected to lease the entire 2,390 acres and to extend for 12 months the time within which drilling operations might be commenced by paying a selection bonus at the rate of $25 per acre, a total of $59,750.

On October 10, 1963, Bernard offered to lease the petitioner's entire unleased 5,640 acres for a consideration of $25 per acre, a total of $141,000. The offer was rejected by the petitioner.

The petitioner's receipts and disbursements for its fiscal years ended March 31, 1944 through 1963, were as follows:

| Fiscal year ended Mar. 31— | Receipts | | | | | | | Disbursements |
| | Dues [1] | Service charges and guest charges [2] | Total dues, service charges, and guest charges | From oil and gas leases | Interest | Miscellaneous | Total | |
|---|---|---|---|---|---|---|---|---|
| 1944 | $4,400 | $4,161.00 | $8,561.00 | $14,219.20 | $764.92 | [3] $192.12 | $23,737.24 | $10,168.69 |
| 1945 | 4,750 | 4,103.50 | 8,853.50 | 11,473.96 | 1,000.00 | [4] 4,138.34 | 25,465.80 | 9,590.39 |
| 1946 | 4,950 | 4,114.00 | 9,064.00 | 18,172.18 | 1,148.78 | 1,000.00 | 29,384.96 | 16,574.70 |
| 1947 | 4,950 | 2,524.00 | 7,474.00 | 7,093.78 | 1,500.00 | 0 | 16,067.78 | 16,890.99 |
| 1948 | 4,950 | 1,772.52 | 6,722.52 | 19,587.96 | 1,500.00 | 0 | 27,810.48 | 28,268.25 |
| 1949 | 4,950 | 1,892.35 | 6,842.35 | 9,064.81 | 1,500.00 | 146.06 | 17,553.22 | 8,476.39 |
| 1950 | 4,950 | 2,587.85 | 7,537.85 | 21,796.68 | 1,875.00 | 0 | 31,209.53 | 20,644.96 |
| 1951 | 4,900 | 2,149.00 | 7,049.00 | 20,885.49 | 1,900.00 | 103.42 | 29,937.91 | 13,203.58 |
| 1952 | 4,900 | 2,456.00 | 7,356.00 | 39,209.12 | 2,237.87 | 102.43 | 48,905.42 | 13,903.21 |
| 1953 | 4,900 | 3,310.30 | 8,210.30 | 39,445.96 | 2,550.87 | 0 | 50,207.13 | 16,591.27 |
| 1954 | 4,900 | 3,130.00 | 8,030.00 | 30,312.65 | 2,553.38 | 0 | 40,896.03 | 38,035.76 |
| 1955 | 4,900 | 2,716.00 | 7,616.00 | 45,051.46 | 2,051.89 | 0 | 54,719.35 | 35,990.14 |
| 1956 | 4,900 | 4,045.00 | 8,945.00 | 30,354.73 | 3,147.91 | 0 | 42,447.64 | 29,527.33 |
| 1957 | 4,900 | 3,640.00 | 8,540.00 | 395,807.71 | 4,036.94 | 100.00 | 408,484.65 | 27,192.15 |
| 1958 | 4,900 | 5,114.50 | 10,014.50 | 7,678.41 | 10,504.57 | 100.00 | 28,297.48 | 54,882.23 |
| 1959 | 4,900 | 4,267.80 | 9,167.80 | 73,675.83 | 19,159.32 | 0 | 102,002.95 | 43,130.45 |
| 1960 | 4,900 | 2,379.15 | 7,279.15 | 11,924.43 | 17,116.41 | 0 | 36,319.99 | 34,174.61 |
| 1961 | 4,900 | 1,991.00 | 6,891.00 | 10,011.92 | 23,005.70 | 0 | 39,938.62 | 21,399.22 |
| 1962 | 4,900 | 1,359.50 | 6,259.50 | 8,320.52 | 21,383.77 | 0 | 35,963.79 | 31,246.94 |
| 1963 | 4,900 | 1,621.00 | 6,521.00 | 70,237.62 | 19,971.44 | 0 | 96,720.06 | 39,275.73 |

[1] With only 99 shares outstanding during the taxable years and three members excused from paying dues the receipt of $4,900 per year rather than $4,800 is unexplained.
[2] The extent to which these charges covered the expenses for the services provided is not readily determinable from the record.
[3] Tax refund.
[4] Tax refund of $1,388.43; net proceeds of suit against Shell, $2,749.91 ($5,000 settlement less litigation costs, $2,250.09).

Of the $70,237.62 in royalties received by the petitioner during the fiscal year ended March 31, 1963, the amount of $40,221.95 represented the royalties for that year and the remaining $30,015.67 represented royalties for the fiscal years ended March 31, 1958 through 1962, held back by Shell pending approval by the Federal Power Commission of an increased price for certain gas sold by Shell.

The petitioner's disbursements during the fiscal years ended March 31, 1957 through 1960, consisted of the following:

| Item | Fiscal year ended Mar. 31— | | | |
| | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|
| Secretary's salary | $1,200.00 | $2,300.00 | $2,400.00 | $2,400.00 |
| Other salaries and wages | 5,680.00 | 5,910.00 | 6,135.00 | 5,640.00 |
| Taxes | 1,360.21 | 1,472.21 | 1,513.64 | 1,368.63 |
| Rent | 500.00 | 500.00 | 500.00 | 735.00 |
| Groceries | 2,223.07 | 3,156.70 | 2,668.85 | 2,059.55 |
| Fuel and electricity | 538.22 | 1,003.38 | 745.62 | 705.20 |
| Gas and oil | 978.31 | 1,126.80 | 963.45 | 819.30 |
| Repairs and renewals | 5,349.29 | 22,713.23 | 23,416.83 | 12,892.20 |
| Guides and patrolmen | 424.00 | 661.00 | 690.00 | 420.00 |
| Insurance | 1,517.71 | 3,794.32 | 1,827.58 | 1,082.97 |
| Legal fees and expenses | 2,725.34 | 5,646.87 | 258.14 | 648.30 |
| Tractor and implements | | | | 3,148.74 |
| Telephone | 533.90 | 428.91 | 228.82 | 491.21 |
| Miscellaneous | 4,162.10 | 3,668.81 | 1,782.52 | 1,763.51 |
| Donations | | 2,500.00 | | |
| Total disbursements | 27,192.15 | 54,882.23 | 43,130.45 | 34,174.61 |

The expenditures for "Repairs and renewals" during the fiscal years ended March 31, 1957 through 1960, consisted of the following items:

| Item | Fiscal year ended Mar. 31— | | | |
|---|---|---|---|---|
| | 1957 | 1958 | 1959 | 1960 |
| Dragline rental and expenses | 0 | $7,881.03 | $4,180.00 | 0 |
| Boat repairs and parts | $782.25 | 2,012.03 | 163.69 | $1,695.26 |
| Building materials | 730.49 | 5,787.14 | 864.23 | 594.46 |
| Building repairs | 0 | 6,205.25 | 825.42 | 0 |
| Labor | 647.50 | 456.00 | 460.00 | 790.00 |
| Electrical materials and labor | 716.70 | 0 | 0 | 135.70 |
| Digging trails | 0 | 0 | 0 | 4,700.00 |
| Planting millet, etc | 0 | 1,000.00 | 612.10 | 0 |
| Shell for road repair | 0 | 0 | 3,187.80 | 0 |
| Miscellaneous supplies and maintenance | 562.13 | 108.86 | 254.78 | 37.28 |
| Land survey | 0 | 0 | 2,985.00 | 0 |
| Furniture, equipment, and appliances | 1,174.47 | 0 | 168.56 | 203.15 |
| Fences, gates, posts, and barbed wire | 0 | 489.96 | 51.15 | 1,661.13 |
| Purchase of boats | 735.75 | 0 | 10,664.10 | 3,275.22 |
| Total | 5,349.29 | 23,940.27 | 24,416.83 | 13,092.20 |
| Less: | | | | |
| Insurance proceeds for hurricane damage | 0 | 869.80 | 0 | 0 |
| Sale of boats | 0 | 357.24 | 1,000.00 | 200.00 |
| Net expenditures | 5,349.29 | 22,713.23 | 23,416.83 | 12,892.20 |

The excess of the petitioner's receipts over its disbursements for its fiscal years ended March 31, 1944 through 1963, and its accumulated surplus from operations as of the end of each of those years, were as follows:

| Fiscal year ended Mar. 31— | Excess of receipts over disbursements | Accumulated surplus | Fiscal year ended Mar. 31— | Excess of receipts over disbursements | Accumulated surplus |
|---|---|---|---|---|---|
| Balance, Apr. 1, 1943 | | $58,900.98 | 1954 | $ 2,860.27 | $207,157.94 |
| 1944 | $13,568.55 | 72,469.53 | 1955 | 18,729.21 | 225,887.15 |
| 1945 | 15,875.41 | 88,344.94 | 1956 | 12,920.31 | 238,807.46 |
| 1946 | 12,810.26 | 101,155.20 | 1957 | 381,292.50 | 620,099.96 |
| 1947 | (823.21) | 100,331.99 | 1958 | (26,584.75) | 593,515.21 |
| 1948 | (457.77) | [1] 99,874.22 | 1959 | 58,872.50 | 652,387.71 |
| 1949 | 9,076.83 | 108,380.70 | 1960 | 2,145.38 | 654,533.09 |
| 1950 | 10,564.57 | 118,945.27 | 1961 | 18,539.40 | 673,072.49 |
| 1951 | 16,734.33 | 135,679.60 | 1962 | 4,716.85 | 677,789.34 |
| 1952 | 35,002.21 | 170,681.81 | 1963 | 57,444.33 | 735,233.67 |
| 1953 | 33,615.86 | 204,297.67 | | | |

[1] After deduction of $570.35 for scrapped truck written off the books.

At the end of the fiscal years ended March 31, 1957 through 1963, the petitioner held cash and U.S. Government bonds, as shown by its books and returns, in the following amounts:

| Year ended Mar. 31— | Cash | U.S. Government bonds | Total |
|---|---|---|---|
| 1957 | $450,035.57 | $150,000.00 | $600,035.57 |
| 1958 | 48,990.75 | 524,250.00 | 573,240.75 |
| 1959 | 102,396.86 | 530,000.00 | 632,396.86 |
| 1960 | 102,819.15 | 530,000.00 | 632,819.15 |
| 1961 | 45,874.47 | 604,553.00 | 650,427.47 |
| 1962 | 51,025.64 | 605,000.00 | 656,025.64 |
| 1963 | 45,891.15 | 667,912.40 | 713,803.55 |

The petitioner has never paid any cash dividends or made any other distributions to its shareholders.

In May 1945, two shares of the petitioner's stock, held as treasury stock, were sold for $1,000 per share.

During the period from January 1, 1953, to April 30, 1963, shares of the petitioner's stock were sold by its shareholders as follows:

| Date of transfer | Sale price | Date of transfer | Sale price |
|---|---|---|---|
| Feb. 4, 1953 | $2, 000 | Feb. 15, 1962 | $5, 000 |
| Feb. 4, 1953 | 2, 000 | Feb. 15, 1962 | 5, 000 |
| June 18, 1953 | 2, 000 | Feb. 15, 1962 | 5, 000 |
| July 28, 1953 | 1, 000 | Nov. 8, 1962 | 5, 000 |
| Aug. 30, 1954 | 3, 000 | Dec. 29, 1962 | 3, 500 |
| May 26, 1955 | 2, 000 | Dec. 31, 1962 | 5, 000 |
| Sept. 21, 1956 | 3, 000 | Feb. 14, 1963 | 5, 000 |
| May 30, 1960 | 3, 760 | Feb. 14, 1963 | 5, 000 |

At the annual meeting of the petitioner's stockholders held on May 21, 1963, the following action took place, as stated in the minutes of the meeting:

The feasibility of adding additional private room to the Club building was discussed and the President requested the Building Committee to investigate and report to the Directors.

In a letter dated August 6, 1963, from the chairman of the petitioner's building committee to the petitioner's secretary, it was estimated that the cost of a new clubhouse would be $125,000, for a building described as "a lodge type structure with kitchen and dining facilities, together with ten private bedrooms and one large dormitory." It was also estimated that the cost of constructing facilities for guides, cooks, waiters, and other employees would be $9,500, and that a shelter for cars, boat trailers, and other vehicles would cost an additional $7,300 if such a shelter were desired. At an undisclosed time in 1963, one of the petitioner's members who is an architect was added to the building committee and prepared some preliminary sketches of various types of clubhouses. As of the time of the trial herein, the board of directors had not approved any plans for a new clubhouse, nor had it appropriated any funds therefor.

At the annual meeting of the petitioner's shareholders held on May 21, 1963, a committee was also appointed "to see what can be done to improve fishing conditions at the Club." In June 1963, the Soil Conservation Service advised the petitioner that the repairing of the levees adjoining the petitioner's property, which was then contemplated, would create an open-water area which would be a fish habitat. It further advised the petitioner that an additional fishing area, if desired, could be provided by creating a 40-acre pond through the construction of additional levees near the clubhouse, adjacent to the petitioner's waterpump. On October 16, 1963, the petitioner re-

ceived an estimate from a contractor of $3,875 to $4,075 as the cost of such construction.

In September 1963, work was begun on the construction of new ditches and levees along portions of the western, southern, and eastern boundaries of the petitioner's property, the repairing and enlarging of certain existing levees which had eroded and deteriorated, and the deepening of a water trail crossing the property. The contractor performing the work originally estimated the cost to the petitioner to be $2,600 per mile, or approximately $31,200 for a total of 12 miles. In November 1963, after consulting with engineers of the Soil Conservation Service who provided advice regarding the size and location of the levees, the contractor revised his estimate concerning the cost of the levees to $3,300 per mile.

The petitioner received substantial, recurring income from activities not related to the recreational purposes for which it was organized and those activities were entered into for the purpose of making a profit.

The earnings accumulated by the petitioner and held in cash and U.S. Government bonds are greatly in excess of the reasonable needs of the petitioner for its pleasure and recreational purposes, including the improvements of its facilities reasonably contemplated by the petitioner.

During each of the taxable years herein a part of petitioner's net earnings inured to the benefit of its private shareholders.

OPINION

TURNER, *Judge:* At the outset, it may be well to remember that it is a basic principle of tax law that exemption provisions are to be strictly construed against rather than in favor of exemption; that the prescribed tests and requirements for exemption must be met by the party claiming exemption and where there is doubt construction must be in favor of the taxing authority.[2]

To qualify under section 501(c)(7) of the Internal Revenue Code of 1954 for exemption from tax under section 501(a), a "club" must be both "organized and operated exclusively for pleasure, recreation,

---

[2] *United States* v. *Stewart,* 311 U.S. 60 ; *Helvering* v. *Northwest Steel Rolling Mills, Inc.,* 311 U.S. 46 ; *Bank of Commerce* v. *Tennessee,* 161 U.S. 134 ; *Yazoo & Mississippi Valley Railroad Co.* v. *Thomas,* 132 U.S. 174. With respect to religious, charitable, scientific, and educational organizations, however, it has been held that by reason of the benefits derived by the public from their operations the exempting provisions of the statute are to be liberally construed in favor of exemption. *Seasongood* v. *Commissioner,* 227 F. 2d 907 ; *United States* v. *Proprietors of Social Law Library,* 102 F. 2d 481 ; *Cochran* v. *Commissioner,* 78 F. 2d 176. See also *Trinidad* v. *Sagrada Orden,* 263 U.S. 578. The same reasoning was applied in *Scofield* v. *Rio Farms, Inc.,* 205 F. 2d 68, involving the exemption of "Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare."

and other nonprofitable purposes" and it is not so exempt if any part of its "net earnings inures to the benefit of any private shareholder." [3]

The respondent does not dispute the claim that petitioner was organized exclusively for pleasure and recreation, but he does take issue with the claim that petitioner was operated exclusively for pleasure, recreation, and other nonprofitable purposes and with the claim that no part of *i*ts net earnings inured to the benefit of any shareholder.

The petitioner on brief states the "fundamental question" to be "whether the passive receipt by petitioner of oil and gas income from its lands prevented it from being operated exclusively for pleasure and recreational purposes within the meaning of Section 501 (c) (7), where the funds derived therefrom have always been used, or held for use, by petitioner in connection with its exempt purposes."

As supplying the foundation for this proposition, petitioner cites and relies on the pronouncements of the Supreme Court in *Trinidad* v. *Sagrada Orden*, 263 U.S. 578. At issue there was the status of Sagrada Orden under that provision of the Revenue Act of 1913 to the effect that the tax therein imposed did not apply "to any corporation or association organized and operated exclusively for religious, charitable, scientific, or educational purposes, no part of the net income of which inures to the benefit of any private shareholder or individual."

It was conceded that Sagrada Orden was organized and operated for religious, charitable, and educational purposes and that no part of its net income inured to the benefit of any private stockholder or individual, leaving for decision only the question whether by reason of its income-producing activities it was "operated exclusively" for the desired purposes.

That a corporation might be organized and operated exclusively for religious, charitable, scientific, and educational purposes and "yet have a net income" the Court regarded as apparent on the face of the statutory clause under consideration, and next, noting that the clause said nothing about "the source of the income," concluded that it made "the destination [of the income] the ultimate test of exemption." And, pointing out that the income derived from its property and business activities was used exclusively for the purposes specified in the statute, the holding of the Court was that Sagrada Orden was

---

[3] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.
(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a) :

\* \* \* \* \* \* \*

(7) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.
SEC. 501(a). EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401 (a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

"operated exclusively" for religious, charitable, and educational purposes within the meaning of the statute, and was thus exempt from tax. In so holding, the Court observed that "Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain."

Petitioner's reliance on *Trinidad* v. *Sagrada Orden, supra,* is, in our opinion, misplaced. We do not have here a religious, charitable, scientific, or educational organization, the objectives and purposes of which denote a beneficent or public purpose, but a private club, the objectives and operations of which are primarily, if not for all practical purposes exclusively, for the personal pleasure and recreation of the individual members and their guests. Furthermore, as the Court in the *Sagrada Orden* case pointed out, there was in the statute, applicable in that case, no proscription of profitmaking operations or activities, the test for exemption being the ultimate purposes to which the income was put, not the manner or source from which it was derived, whereas under section 501(c)(7), to which petitioner here looks for exemption, the operations must be exclusively for pleasure, recreation, and *other* nonprofitable purposes and operations for profitmaking purposes are thus proscribed.

The current statutory provision governing the exemption of religious, charitable, scientific, and educational organizations is section 501(c)(3), which for the purposes here carries the same provisions in substance if not literally as far back as G.(a) of the Revenue Act of 1913. In enacting the Revenue Act of 1950, however, Congress concluded that unrelated business income should not be exempt from tax even though such income should ultimately be used exclusively for the purposes for which the exemption to such organizations had under the various revenue acts been granted. And while continuing the exemption to those organizations with respect to other income, it separately imposed a tax on their unrelated business income and in addition denied exemption from tax where the organization engaged in certain specified "prohibited transactions." See secs. 301, 302, 331, and 332, 1950 Rev. Act. The current comparable provisions are sections 503 and 504 of the 1954 Code, which deny exemption by reason of the specified "prohibited transactions," and sections 511, 512, and 513, taxing and defining unrelated business income. Accordingly, Congress still does not deny exemption from tax to the organizations described in section 501(c)(3) where they indulge in operations for profit, and the use to which the income is put is still the ultimate test for their exemption under section 501(a), but it has in section 511 imposed a tax on that part of the income of such organizations constituting "unrelated business taxable income," which is defined in section 512 as the gross income from any "unrelated trade or business,"

less allowable deductions, subject, however, to the exceptions, additions, and limitations which are specifically set forth in section 512(b). The term "unrelated trade or business" is defined in section 513 as "any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501." Thus in sections 511, 512, and 513 Congress has not only specified the organizations which are now taxable on their unrelated business income, but it has spelled out with particularity that part of their income which is to be taxed and that not to be taxed. And as noted above, it has refrained from making realization of the income so taxed a bar to exemption from tax on all of the income which is not specifically taxed under section 511.

Here, however, the situation is otherwise. There is no provision comparable to section 511 which separately taxes a club on its unrelated business income so as to leave it exempt on its other income as is the case with religious, charitable, and educational organizations. A club either meets the requirements of section 501(c)(7) for exemption from tax or it must respond to tax on its income pursuant to the general provisions of the Internal Revenue Code. And to be exempt under section 501(c)(7) it must be operated "exclusively for pleasure, recreation, and other nonprofitable purposes," the use of the words "and other nonprofitable purposes" making it clear that operations for pleasure and recreation are not in and of themselves enough. There must be an absence of operations for profitable purposes. These requirements for exemption as set forth in section 501(c)(7) have been continued by Congress without change since they were first enacted as section 11(a) Ninth of the Revenue Act of 1916.

There have, however, been some changes and revisions of the applicable regulations promulgated by the Commissioner under various of the revenue acts. The first regulation was article 72 of Regulations 33 governing collection of the income tax imposed by the Revenue Act of 1916, as amended by the Revenue Act of 1917. Following a sentence reciting the statutory wording of the requirements for exemption, article 72 was as follows:

This exemption will reach practically all social and recreation clubs which are supported by membership fees, dues, and assessments.

If a club, by reason of the comprehensive powers granted in its charter, engages in traffic, in agriculture, or horticulture, in the sale of real estate, timber, etc., for profit, it will be held that such club is not organized and operated exclusively for pleasure, recreation, or social purposes. It thus becomes a business or commercial enterprise, and any profit realized from such activities is subject to the tax imposed by this title, and the club so operated must make returns of annual net income.

In article 520 of Regulations 45 under the Revenue Act of 1918, the recitation of the requirements as they appeared in the statute was eliminated and the applicable regulation was stated as follows:

ART. 520. Social clubs.—The exemption applies to practically all social and recreation clubs which are supported by membership fees, dues and assessments. If a club, by reason of the comprehensive powers granted in its charter, engages in traffic, in agriculture or horticulture, or in the sale of real estate, timber, etc., for profit, such club is not organized and operated exclusively for pleasure, recreation or social purposes, and any profit realized from such activities is subject to tax.

Thereafter, except for specific reference, in some instances, to the pertinent section of the current revenue act, this regulation was continued without change in the regulations under the Revenue Acts of 1921, 1924, 1926, 1928, and 1932.

To article 101(9)–1 of Regulations 86, the applicable regulation under the Revenue Act of 1934, a new sentence was added. Otherwise the regulation remained as it had been beginning with Regulations 45 under the Revenue Act of 1918. The new sentence was as follows: "If a club, otherwise exempt, sells any of its property at a profit, it is not exempt for the taxable year for which the profit is taxable." This regulation as so expanded was continued without change as article 101(9)–1 of Regulations 94 under the Revenue Act of 1936, Regulations 94 being promulgated November 12, 1936.

On December 10, 1936, *Santee Club* v. *White*, 87 F. 2d 5, was decided by the U.S. Court of Appeals for the First Circuit. The Santee Club was a hunting and fishing club owning and using some 25,000 acres of land in South Carolina for those purposes. In 1930, a tract, comprising approximately 1½ percent of the total tract, theretofore used for wildfowl shooting, became valueless for that purpose by reason of the growth of a "food-destroying weed," and being of no further use to the club that portion of the club land was sold at a profit of $4,411.60. The money received was used for improvements on other parts of the club property and for general club purposes. No part was distributed to members nor were the dues diminished. The Commissioner collected a tax on the profit realized from the sale. Upholding the exempt status of the club, the court reasoned that the club was not obliged to hold indefinitely the piece of property which had become valueless for club purposes and that the sale of the tract was incidental to the general purposes for which the club was organized and operated. It regarded as very doubtful that the single transaction there in question constituted the engaging in the sale of real estate for profit under the applicable regulation, article 530 of Regulations 74, promulgated under the Revenue Act of 1928, and held that a single transaction of incidental character did not constitute engaging in business for profit contrary to the requirements of the statute.

Though, as indicated, the regulation under consideration in *Santee Club* v. *White, supra,* namely, article 530 of Regulations 74, did not carry the provision that if a club, otherwise exempt, sells any of its property at profit, it is not exempt for the year of the sale, as did the later Regulations 86 and 94 under the Revenue Acts of 1934 and 1936, the Commissioner, shortly thereafter, acceded to the ruling of the court in the *Santee* case and, by T.D. 4760, approved September 7, 1937, amended article 101(9)–1 of both Regulations 86 and 94 by striking the sentence in question and substituting therefor the sentence "Generally, an incidental sale of property will not deprive the club of exemption." Eliminated also were the words "by reason of the comprehensive powers granted in its charter" in describing the proscribed activities. As amended, article 101(9)–1 was as follows:

ART. 101(9)–1. Social clubs.—The exemption granted by section 101(9) applies to practically all social and recreation clubs which are supported by membership fees, dues, and assessments. If a club engages in traffic, in agriculture or horticulture, or in the sale of real estate, timber, etc., for profit, such club is not organized and operated exclusively for pleasure, recreation, or social purposes. Generally, an incidental sale of property will not deprive the club of the exemption.

As so amended this regulation was repromulgated without change as article 101(9)–1 of Regulations 101 under the Revenue Act of 1938 and section 39.101(9)–1 of Regulations 118, approved September 23, 1953.

The current regulation applicable to the taxable years herein is section 1.501(c)(7)–1, Income Tax Regs.,[4] promulgated under section 501(c)(7) of the Code. Except for the recitation of the requirements and conditions for exemption as set forth in the statute and for two provisions new to the regulations, the regulation where not identical is in substantial respects the same as it had been since the issuance of T.D. 4760. After declaring that in general the "exemption extends to social and recreation clubs which are supported solely by membership fees, dues, and assessments," it formally declares for the first time

---

[4] Sec. 1.501(c)(7)–1 Social clubs.

(a) The exemption provided by section 501(a) for organizations described in section 501(c)(7) applies only to clubs which are organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, but does not apply to any club if any part of its net earnings inures to the benefit of any private shareholder. In general, this exemption extends to social and recreation clubs which are supported solely by membership fees, dues, and assessments. However, a club otherwise entitled to exemption will not be disqualified because it raises revenue from members through the use of club facilities or in connection with club activities.

(b) A club which engages in business, such as making its social and recreational facilities available to the general public or by selling real estate, timber, or other products, is not organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, and is not exempt under section 501(a). Solicitation by advertisement or otherwise for public patronage of its facilities is prima facie evidence that the club is engaging in business and is not being operated exclusively for pleasure, recreation, or social purposes. However, an incidental sale of property will not deprive a club of its exemption.

that "a club otherwise entitled to exemption will not be disqualified because it raises revenue from members through the use of club facilities or in connection with club activities," and that "A club which engages in business, such as making its social and recreational facilities available to the general public" is not organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes and is not exempt under section 501(a). Similarly, as in the regulations under prior acts, it provides that "A club which engages in business * * * by selling real estate, timber, or other products, is not organized and operated exclusively for pleasure, recreation and other nonprofitable purposes, and is not exempt." The regulation concludes with the provision, "However, an incidental sale of property will not deprive a club of its exemption."

Both the provision declaring as permissive the raising of revenues from members through club activities and the provision proscribing the use of club facilities in profitmaking activities with the public, although new to the regulation, are declarations of principle long established. See *Santee Club* v. *White, supra;* and *Westside Tennis Club* v. *Commissioner*, 111 F. 2d 6. See also *Jockey Club* v. *Helvering*, 76 F. 2d 597.

The petitioner takes the position that its oil- and gas-leasing activities were not an engaging in business within the meaning of the regulation because they were "subordinate to," "consistent with," and "in furtherance" of its "exempt purposes" and that this is so because the income therefrom was "passively" received and not due to any activity on its part in exploring for or in the production of oil and gas and further that the leasing of the property was "in furtherance" of its "exempt purposes" within the meaning of the statute and regulations because the income so derived was either used or held for use solely for the recreational purposes of the club and none of it was distributed to or among its members. As support for this latter contention, it relies on *Koon Kreek Klub* v. *Thomas*, 108 F. 2d 616, and particularly that portion of the opinion stating that "Indeed, if the club could be made self-sustaining by grazing fees, guest fees, and by other perquisites, its operations being for the stated purposes would not be affected." Suffice it to say at this point that the court there did not have before it the case of a club which was self-sustaining or substantially so from income from nonmembers or outsiders.

The facts do not in our opinion support the conclusions that petitioner's oil- and gas-leasing activities were either "subordinate to" or "consistent with" the statutory requirements that not only must the operations be exclusively for pleasure and recreation but they must likewise be for nonprofitable purposes. And to imply that a club merely by engaging in recreational activities is operating for "exempt

purposes" within the meaning of the statute is in itself a begging of the question before us. The leasing activities were "in furtherance of" the recreational purposes and activities of the club members, but only in that the income produced from these transactions with nonmembers, which to the extent used, was used solely to promote the personal and individual pleasure and enjoyment of the club members and their guests, and this without the necessity on the part of the members to make provision therefor through "membership fees, dues, and assessments," or from club activities or the use of the club facilities by them. Rather the club members were to a most substantial extent enjoying a free ride from the nonrecreational use of their properties.

The facts do show that petitioner did during the legally prescribed duck-hunting season continue to devote its property to the use by its members for the duck-hunting purposes for which it was organized, but they also show that it likewise regularly committed and devoted its land to the unrelated and nonrecreational purpose of producing profits through the leasing thereof to nonmembers or outsiders for oil and gas exploration and production and that under these leases it did regularly and consistently realize profits in such amounts as to overshadow its revenue from its members, namely, its receipts from dues and services and guests charges.

In April of 1945, within 2 to 3 months following the release of 5,640 acres of its land by Shell from its 1935 lease, petitioner again leased the said acreage to one Doyle who shortly thereafter assigned the lease to Stanolind Oil & Gas Co. The lease provided for both a bonus payment and an annual delay rental as well as a royalty on any oil and gas produced. Under the Stanolind lease petitioner during the fiscal year ended March 31, 1946, received $11,280 to cover the bonus and delay rental. There was no production, however, and Stanolind on April 10, 1947, relinquished its rights under the lease.

Some 25 days later, on May 5, 1947, petitioner executed a lease with Sohio Petroleum Co. covering 1,710 acres. This lease likewise provided for royalty on production. Under this lease petitioner received a bonus and delay rental payments during the fiscal year ended March 31, 1948, for a total of $7,060. Exercising its privileges to do so, Sohio on August 21, 1947, released to petitioner 640 of the 1,710 acres and on October 5, 1948, released the remaining 1,070 acres. Here again there was no production.

There was no further leasing of its property by petitioner until February 28, 1952, when 1,800 acres were again leased to Shell. In the interval, however, according to the testimony of the then Shell area land agent, petitioner and other landholders were making complaints to Shell that their properties were being drained of gas by

one or more of Shell's producing wells. There were four different zones of production in the area and the complaints were that a well producing from one zone would be draining gas from adjoining property on which there was no well to the zone in question. The landowners, including petitioner, were pressing Shell for further development or some action which would eliminate this condition. Also during the interim between the Sohio lease and the 1952 lease by Shell, petitioner pursuant to its 1935 lease received oil and gas royalties of $12,527.96 in 1948, $9,064.81 in 1949, $21,796.68 in 1950, $20,885.49 in 1951, and $21,209.12 in 1952.[5]

Petitioner's 1952 lease to Shell covered 1,800 acres immediately south of the 360 acres still held by Shell under its 1935 lease and provided for a cash bonus of $18,000 and an annual delay rental of $18,000 as well as a royalty covering any oil and gas produced. For the years 1952 through 1956 petitioner received payments under this lease of $18,000 per year, for a total of $90,000, as well as oil and gas royalties from production under the 1935 lease ranging from a low of $12,312.65 for 1954 to a high of $27,051.56 in 1955.

Petitioner continued to complain to Shell that the 1,800 acres covered by the 1952 lease were being drained of gas by other wells belonging to Shell and pressed Shell for development. Other lessors owning property adjacent to that of petitioner were continuing their similar complaints and, as a result, work began looking to a pooling agreement between Shell and the various lessors whereby the properties would be set up as a unit and the royalties would be paid by Shell through allocation to the various properties according to the estimated gas reserves underlying the respective tracts. The three Shell lessors who, in addition to petitioner, were affected parties, signed the proposed agreement in September 1954, but as between Shell and petitioner there continued to be various matters which had to be resolved and negotiations between them continued. In connection therewith the petitioner employed a geologist to make a study in its behalf of the potential production on the portion of its property to be affected by the agreement.

The unitization agreement was executed by Shell and petitioner in May of 1955. In addition to specified property of the three other parties, the agreement covered the 360 acres of petitioner's property covered by the 1935 lease and 220 acres of the 1,800 acres covered by the 1952 lease. The royalty payments thereafter made by Shell to petitioner were pursuant to the unitization agreement. Under the agreement 12.53 percent of the total production of the unit was allo-

---

[5] Where in this opinion there is reference to a particular year and the reference relates to receipts, income, net earnings, expenditures, and the like, the reference means a fiscal year ending on Mar. 31 of the year designated.

cated to the 360-acre tract and 3. 97 percent to the 220-acre tract. By a separate agreement of even date petitioner was to receive from Shell under the 1952 lease an additional royalty computed on its share of the unit production until it had received as such additional royalty the sum of $100,000. September 1, 1954, was specified to be the effective date of the unitization agreement.

Under date of January 4, 1957, the vice president for Shell's New Orleans area requested authorization by the New York office for the drilling of a well on petitioner's property to the depth of 16,500 feet. It was pointed out that the expiration date of Shell's lease to "1,600" of the 1,800 acres held under the 1952 lease was February 27, 1957; that the "1,600" acres had "prospects for a very rich gas accumulation"; and that the drilling of the proposed well would validate Shell's existing lease. After reviewing the geophysical information of the area the opinion was expressed that there was a possibility "of discovering a major gas reserve" similar to the very rich reserve previously discovered at Lake Arthur, some 17 miles northeast. The cost of the completed well was estimated at $950,000 but if the well turned out to be a dry hole the cost was estimated at $834,000. It was pointed out that the existing Coastal Club lease was offset by open acreage of Coastal Club land and by leases held by Frankfort Oil Co. The New York office was advised that an attempt would be made to acquire a lease on the open acreage and to form a joint arrangement with Frankfort for the drilling of the well. But, "in order * * * to protect Shell's large and promising lease," request was made for authority to drill the well for Shell's account without the help of others, if necessary. Under date of January 25, 1957, Shell's production department authorized the expenditure of up to $950,000 for the drilling of the proposed well.

In keeping with the course of action outlined in the above letter, Shell, acting through a lease brokerage firm, began negotiations with petitioner for a new lease which would also cover that part of the Coastal Club land not under lease. On January 23, 1957, petitioner's directors appointed a committee to conduct the negotiations on its behalf. In consideration of the payment of $10,000 by Shell the parties, on February 11, 1957, extended the term of the 1952 lease pending the outcome of the negotiations for the new lease.

The next day, February 12, 1957, petitioner's president, by letter, reported the developments to the members of petitioner's board of directors. His letter was in part as follows:

The purpose of this letter is to call your attention to the Club's future as far as hunting and fishing is concerned if and when our lands are fully developed to produce minerals. It is the general consensus that a distillate or gas field will not interfere with the hunting and fishing as would an oil field; and we

should all recognize that the discovery of an oil field would to all practical purposes put an end to hunting and fishing.

The committee today in discussing the need with the undersigned and your secretary feels that it should be empowered to negotiate at once with Miami Corporation or any other land owner in the vicinity in view of getting a lease or an option to lease acreage which would be available in the event our present acreage becomes useless.

The negotiations between Shell and petitioner's committee resulted in the execution of a new lease on March 22, 1957. This lease was for a primary term of 3 years and covered 5,640 acres, being all of petitioner's land not covered by the 1935 lease. It provided for payment of a cash bonus of $384,000 by Shell, an annual delay rental of $282,000, and a royalty covering the production of oil and gas except as to designated horizons of the 220 acres of land included in the unitization agreement, which continued to be subject to that agreement. The $10,000 paid as consideration for the extension of the 1952 lease was credited to the $384,000.

On May 6, 1957, following the execution of the new lease, petitioner's board of directors authorized its committee, which had negotiated the lease with Shell, to employ a geologist to make a subsurface survey and estimate of the oil, gas, and minerals underlying petitioner's land and to "employ a tax attorney and expert to work with counsel for the corporation to plan a method of distribution of corporate assets which, in the opinion of the attorneys, will have the least tax consequences." Under this authorization a firm of consulting geologists was employed to make the survey and the accounting firm of Lybrand, Ross Bros. & Montgomery was engaged to do the tax planning.

By letter dated September 17, 1957, the geologists reported their estimate of the fair market value of petitioner's property to be $618,900 as of August 1, 1957. Of that amount $54,900 was shown as the discounted value of petitioner's interest in future production under the unitization agreement and $564,000 as the estimated value for the 5,640 acres covered by the 1957 lease. Petitioner's future net income under the unitization agreement was estimated at $151,300.

In June of 1957, the accounting firm previously employed by petitioner reported that it believed the correct rule to be that an organization remained tax exempt if the receipt of income was merely incidental to the main purposes of its organization, that its tax-exempt status would not be lost unless "the tail wags the dog," but under that rule the bonus received under the lease during the fiscal year ended March 31, 1957, "would cause grave doubt to be cast upon the Club's tax-exempt status for that year." It then proposed certain steps which might be taken by petitioner to divorce itself from its oil-

leasing activities, which might make it possible for the club to retain its tax-exempt status. It thereafter outlined a course of action, which might be followed to that end.

Subsequently, in a letter dated July 29, 1957, the accounting firm noted two courses open to petitioner: The first, that of following the plan previously outlined in its letter of June 24; and the second, that of doing nothing, stating that if the latter course was followed the club might well lose its tax exemption for the fiscal year ended March 31, 1957, and all subsequent years. It thereafter gave a résumé of the possible effect taxwise on the club and its members, if the exempt status should be lost.

In a letter dated September 18, 1957, it undertook to review the possibilities taxwise if the club decided to continue to exist and operate as before. Among the factors listed as offering possible encouragement were the successful settlement of the prior tax refund suit, that each of petitioner's returns as an exempt organization rather than a taxable corporation started the running of the statute of limitation, and that unless "Treasury" asserted a tax for the year ended March 31, 1957, on or before August 15, 1960, that year would be forever closed, and that similarly another year would be closed on August 15 of each year thereafter. It expressed as being entirely possible that no question would ever be raised by "Treasury" as to petitioner's tax-exempt status, and even if the question should be raised it might be that petitioner would prevail. It expressed the view that if "Treasury" did succeed for the fiscal year ended March 31, 1957, petitioner probably would be taxable for all subsequent years.

Under date of September 23, 1957, petitioner's board of directors reported to its members that it had considered the report of the accounting firm as well as the report of the geologist as to the fair market value of the club's property. Thereafter it listed certain stated findings or conclusions which, among others, called attention to the successful disposition of its previous tax case; that it had regularly filed its Treasury Form 990 "thus cutting the Treasury off from claiming taxes on the income for past years"; that there was no assurance of production in the event Shell did drill under the new lease; and, finally, that continuation of its present course did not foreclose consideration of other alternatives in the future. It, therefore, recommended that the "present status of the club be maintained" and requested a reply within 10 days stating that a failure of reply would be deemed an assent that the board act according to its judgment. Thirty-eight replies were received supporting the conclusion of the board while two were in disagreement. The remaining 50-odd members did not respond. Petitioner decided to continue its operations as before.

Due to the great expense of drilling the well as authorized, Shell had sought the participation of Frankfort Oil Co. which had holdings to the east, but Frankfort declined. However, the execution of the new lease relieved Shell of the previously existing deadline for the drilling of a well and Shell continued its geophysical studies of the area. As a result of these further studies, Shell decided not to drill and by written release executed March 27, 1958, relinquished its rights under the 1957 lease with petitioner.

On February 5, 1959, petitioner entered into an agreement with Pan American Petroleum Corp., formerly Stanolind, under which for a consideration of $62,040 it granted to Pan American the right to conduct a geophysical examination of its entire acreage other than the 360 acres held by Shell.[6] This right was for a period of 6 months with an option to select land for oil and gas leasing. Shortly before the expiration of the 6 months' period, Pan American notified petitioner that it had elected not to lease any of petitioner's property.

As demonstrating that the leasing of its land for oil and gas exploration and production was consistent and in harmony with the maintenance and preservation of its property for the primary purpose for which it was organized, namely, for duck hunting by its members and their guests, petitioner stresses the preservation provisions of the various leases and agreements. It is true that Shell with respect to the 1952 and 1957 leases and Pan American with respect to the 1959 agreement did take cognizance of the Coastal Club duck-hunting activities. With respect to the 1957 lease Shell agreed to conduct its operations in a manner that would least interfere with the hunting and fishing activities, that unless it should prove unreasonably costly or impractical no operations, or a minimum thereof, would be conducted during the duck-hunting season, and that it would use all methods customarily used in the industry to prevent pollution of petitioner's waters with salt water, oil, and other waste. From the provisions of the 1952 lease it would appear that the methods customarily used likely included steps designed to prevent the drainage of the Coastal Club land as well as pollution of its waters. The agreement with Pan American contained provisions similar to those relating to the 1957 lease with Shell. There was no bar in the various leases or the supplemental agreements to the breaching of the levees and the digging of canals to reach and service the locations where drilling was to be performed, and Pan American, in a letter written 2 weeks following the execution of the 1959 exploration agreement, specifically advised petitioner that in the event it dredged a canal from outside to a drilling site it would expect the canal to be left

---

[6] Presumably this agreement excepted the designated horizons of the 220 acres of land still subject to the unitization agreement with Shell.

open from the commencement of operations until the well was completed as a producer or abandoned as a dry hole.

Regardless, however, of the existence in the leases of such preservation provisions or the effectiveness of the steps to be taken thereunder, and even though there was no production from Coastal Club land except under the 1935 lease and the 1955 unitization agreement, the fact remains that the production of oil or gas, or both, was the primary and ultimate objective under all of the leases and agreements with Shell and the various other oil companies. And petitioner's president in his letter in 1957 to the club directors pointed out that they should all recognize that the discovery of an oilfield would for all practical purposes put an end to hunting and fishing, although he did express an opinion that the production of gas or condensate would not interfere as would an oilfield. By these leases and for the realization of profit, petitioner thus recurringly committed its land to the purpose and use of exploring for and the production of oil and gas.

As further indication that its oil- and gas-leasing activities were passive and incidental as related to its recreational activities and were not to be regarded as adversely affecting its exemption status under statute, petitioner also stresses the fact that the initial approach leading to all of its oil and gas leases was in each instance made by the lessee and further that it was not engaged in or responsible for the well-drilling or other production activities. In light of the pattern of the transactions as disclosed by the record overall, we do not regard such facts as of persuasive significance. Petitioner concedes on brief that oil and gas leases normally result from solicitation by the lessee rather than by the lessor, and even so the facts overall show that petitioner did quite industriously busy itself in negotiating the leases and promoting the production of income thereunder. This was particularly true of the unitization agreement and the 1957 lease with Shell. Beyond a doubt, petitioner's property was attractive to established oil companies and new leases or agreements were recurringly entered into closely following the termination of other leases. Shell and Pan American, for instance, after allowing leases to terminate, entered into new leases at greatly increased cost to themselves and correspondingly increased income to petitioner. Furthermore, the evidence shows that a lease broker who had procured an option on Little Lake Misere land adjoining petitioner's property and later leased the land for a term of 12 months at a bonus of $25 per acre, stood ready in 1962 to pay petitioner $15,000 for an option on its land and in 1963 to pay a bonus of $25 per acre, for a total of $141,000, for an oil and gas lease. Petitioner stresses the fact that in each instance the offer was refused and that no leases on its property have been made since the release by Pan American in the latter part of

1959. It is to be noted, however, that it was the testimony of the broker that the stated reason for the rejection of his offer "had something to do with pending tax matters with the Federal Government."

As support for its position the petitioner chiefly relies on *Koon Kreek Klub* v. *Thomas, supra,* and *Scofield* v. *Corpus Christi Golf & Country Club,* 127 F. 2d 452, in both of which the claim of exemption was allowed. Koon Kreek Klub was a private fishing and hunting club and the owner of 6,777 acres of land which it used for those purposes. In addition to approximately $12,500 in dues from members, it regularly received $500 per year for grazing privileges granted to Thomas. In 1934 it also received some $24,000 as the consideration for an oil and gas lease covering its property. For certain of the facts see *Koon Kreek Klub* v. *Thomas,* an unreported case (N.D. Tex. 1939). The oil and gas lease could be renewed for an annual renewal rental of $1 per acre but the lessee decided not to drill and allowed the lease to lapse. Thomas, the holder of the grazing lease, was the owner of 340 acres of land completely surrounded by that of the club. He not only rejected the club's efforts to buy his land but persisted in allowing his cattle to trespass on the club's lands. By means of the grazing lease, peace was attained. For some undisclosed period the club also allowed its club manager grazing privileges on some of its property for $100 per year, but whether for the pertinent period is not clear. Aside from the fact that the grazing lease settled complications bearing directly on the ownership of the club land and its use for hunting and fishing purposes, the income thereunder was comparatively small in amount. With respect to the oil and gas lease income, the $24,000 payment, though comparably substantial, was limited to one year only. There was no production, no recurring leasing activities, and no indication that there would be.

In *Scofield* v. *Corpus Christi Golf & Country Club, supra,* the club property was acquired for and devoted to use for a golf course and clubhouse. In 1936, for a cash bonus of $7,500, a royalty on production, and an oil payment of $60,000 likewise payable from production, the club granted a lease to Taylor Refinery Co. under which four wells were drilled. In 1936, the year in question, the total revenue of the club from dues and club activities was $13,558.17, and the revenue from oil was "$11,554.46, $7,500 bonus and $4,004.44 as royalty." The total expenses of the club operation were $11,472.36. For the first 5 years up to December 31, 1940, the total income under the lease averaged approximately $9,100 per year. At the time of trial two wells had been abandoned and two were still producing but production was decreasing steadily. The club dues were increased from $60 per year prior to the lease to $96 per year in 1941. The club had acquired its property by four deeds in March of 1922 and under each deed the

grantor had reserved a one-twelfth interest in the oil, gas, and mineral rights in and under the land. By 1936 there were several small producing oil and gas wells close to and on three sides of the club property. The vendors of the property demanded oil and gas development in order that they might realize on their reserved interests. The club was advised by its attorney that it would either have to develop the property for oil, purchase the vendors' mineral rights, or permit the vendors to develop the property. The lease to Taylor Refinery Co. resulted from these demands.

Those cases are not this case and are not in our opinion controlling here. In obvious respects the facts are substantially different. Grazing in the *Koon Kreek Klub* case and the oil and gas leases in the *Corpus Christi* case were directly related to or were necessary and essential to the continued operation of the clubs for the recreational purposes for which they were organized. In *Koon Kreek Klub* the efforts to buy a small pocket of land from Thomas were of no avail and until the grazing lease was worked out there were continuing difficulties to the club in the conduct of its operation as a hunting and fishing club. The lease eliminated the friction and furthermore the income realized was comparatively quite small. In *Corpus Christi* the land was acquired and held for use as a golf and country club, subject however to oil, gas, and mineral rights which had been reserved by the vendors. Owning that interest in the land, their demands for development could not be ignored and the club was so advised by its lawyer. Its only alternative to such development, whether by the club or the holders of oil and gas rights, would have been the sale of the property and thus liquidation of its club operations thereon. The oil and gas lease by Koon Kreek Klub was an isolated and nonrecurring transaction. It extended over parts of 2 years although the receipt of income was limited to 1 year. There was no production, no recurring leasing activities and no indication that there would be. The court's reasoning brought it within the pronouncements of *Santee Club* v. *White, supra.* Similarly, we think, *Anderson Country Club, Inc.*, 2 T.C. 1238, also relied on by petitioner, where the profits in question were from the sale of a portion of the club property found not usable for club purposes, may thus be said to be within the ambit of *Santee Club* v. *White* and not this case.

As we have heretofore pointed out, the Commissioner acceding to the pronouncements of the court in *Santee Club* v. *White, supra,* revised his regulation to strike the sentence "If a club, otherwise exempt, sells any of its property at a profit, it is not exempt for the taxable year for which the property is taxable," and substituted therefor the sentence, "Generally, an incidental sale of property will not deprive the club of exemption." In concluding its discussion of the question involved the court in the *Santee Club* case said:

A recreation club often, perhaps generally, makes a profit on the services which it furnishes to its members. Such profits are not taxable as income because they are only incidental to the general nonprofitable purpose for which the Club is organized and operates. Sales of real estate or fixed property are as we have said to be judged by the same test. Are they made as an incident to the regular activities of the Club, or are they entered into in disregard of those purposes for the purpose of profit? The transaction under discussion was clearly of the former character. * * *

Here the facts stand in refutation of the claim that the oil and gas transactions were merely incidental to petitioner's pleasure and recreational purposes. To the contrary, the facts show that not only were the leasing activities not incidental or related to those purposes but in disregard thereof they were entered into "for the purpose of profit" and that the profits therefrom have been both regularly recurring and substantial. Beginning with the fiscal year ended March 31, 1952, the year in which the 1952 Shell lease was executed, petitioner's income from oil and gas leases was in the amounts of $39,209.12 for 1952; $39,445.96 for 1953; $30,312.65 for 1954; $45,051.46 for 1955; $30,354.73 for 1956; $395,807.71 for 1957; $7,678.41 for 1958; $73,675.83 for 1959; and $11,924.43 for 1960.[7] For the same period the expenditures for club operations, maintenance, repairs, and improvements ranged from a low of $13,903.21 for 1952 to $54,882.23 for 1958 and for no year from 1953 through 1963 were they less than $21,000. In contrast the total dues from members have remained at $4,900 or $50 per year per member from 1951, while the total of the dues plus all other charges to members never exceeded $10,014.50, ranging from a low of $7,279.15 for 1960 to the $10,014.50 high for 1958. In only 2 years, 1958 and 1959, have they ever been as high as $9,000.

It thus appears that after paying its costs of operation, maintenance, repairs, and improvements, which costs for the years 1952 through 1960 ranged from approximately twice the total amount received from members for each of the years 1952 and 1953 to more than five times the amount so received for 1958, the petitioner was still able to accumulate substantial balances of income from its oil- and gas-leasing activities, and through those balances plus interest thereon had by March 31, 1957, accumulated a surplus of $620,099.66, represented by cash and U.S. Government bonds. The interests so received ranged from a low of $2,051.89 for 1955 to a high of $19,159.32 in 1959. By the end of the fiscal year 1960 the accumulated surplus had further increased to $654,533.09, and that even though by reason of the heavy expenditures

[7] Although no new leases or agreements had been entered into after the termination of the Pan American agreement in 1959, petitioner continued to realize income from the existing lease and the unitization agreement, $10,011.92 for 1961, $8,320.52 for 1962, and $70,237.62 in 1963. There is evidence tending to show that some substantial part of the $70,237.62 received in 1963 related to production for previous years by reason of a withholding of payments by Shell pending a ruling by the Federal Power Commission.

for maintenance and repairs during the fiscal year 1958 the accumulated surplus, at March 31, 1957, had been reduced by $26,584.75.

In short, to borrow from the words of their consultant on the Federal tax aspects of their operations, the "tail" was during the years indicated, which years include those before us, "wagging the dog." And this, in our opinion, was definitely outside the intent of Congress in its enactment of section 501(c)(7). We accordingly hold that for the years before us petitioner was not operated exclusively for pleasure, recreation, and other nonprofitable purposes within the meaning of the statute.

The petitioner on brief concedes that its oil and gas income has made it possible for Coastal Club to operate and maintain its hunting facilities for the use of its members and their guests, and to make improvements, without the necessity of raising its dues or increasing its charges to members. And the facts show, as noted, that this has been so even though the club expenditures have ranged from approximately two to five times the total of dues and other charges to members. The respondent contends that in this manner oil and gas income inured to the benefit of the Coastal Club members within the meaning of the statute and that the claim of exemption also fails for that reason.

According to Webster's New International Dictionary (2d ed. 1950), the word "inure" means "To pass into use; to take or have effect; to be or become operative; to be applied; to serve to the use or benefit; as, a gift of lands *inures* to the heirs." The word "benefit" is defined to mean: "Specif.: a. Pecuniary advantage or profit." [8] Under those definitions there can be no question, we think, that petitioner's net earnings from its oil- and gas-leasing activities in substantial part, if not *in toto*, did in fact inure to the benefit of its members during the years herein. Certain it is that there is nothing in the established meaning of these words to support any contention that there can be no inurement of such earnings to the benefit of the Coastal Club members unless there is actual distribution to them individually.

Even so it is the contention of petitioner that inasmuch as there have been no actual distributions of any part of its net earnings to or among its members, and the portions thereof which have been expended have been applied to cover its cost of operations, maintenance, repairs, and improvements, no part of its net earnings may be said to have inured to the benefit of any of its members, within the meaning of the statute.

For support of this contention petitioner cites and relies on *Santee Club* v. *White, supra; Koon Kreek Klub* v. *Thomas, supra;* and *Anderson Country Club, Inc., supra.* It will be recalled that the Santee Club was a hunting and fishing club and the profits there involved were from the sale of a very small portion of its land which by reason

---

[8] As used in the dictionary the abbreviation "Specif." means specifically.

of the growth of a "food-destroying weed" had become valueless for club purposes. Noting that the sale was a single isolated transaction and feeling that "the club was not obliged to hold indefinitely a piece of property which for its purposes had become valueless," the court concluded that the sale of the land in question, as in the case of profitmaking transactions with club members, was incident to the regular club activities and not, in disregard of the recreational purposes of its organization, a transaction entered into for the purpose of profit and similarly that the use of the profit so derived for club purposes was not an inurement thereof to the benefit of the members within the meaning of the statute.

As we have already noted, the respondent, very shortly after the *Santee Club* opinion was handed down, amended his regulation to provide that "Generally, an incidental sale of property will not deprive the club of its exemption." And though the regulation does specify that the exemption does not apply "if *any part* of its net income inures to the benefit of any private shareholder [emphasis supplied]," but does not specify that profits from an "incidental sale" of property do or do not inure to the benefit of the club members if applied to club purposes, both *Koon Kreek Klub* and *Anderson Country Club, Inc.*, applying generally the same reasoning as in *Santee Club*, and apparently as corollary to that part of the regulation covering an incidental sale of property, held as in *Santee Club* that there was under the statute no inurement of the profits to the benefit of any club member. In the *Anderson Club* case the profits involved were likewise from the sale of property not usable for club purposes. In *Koon Kreek Klub* neither of the transactions producing the profits at issue was a sale of property, but preliminary to its holding that there was no inurement of profits to the benefit of any club member, the court had held that the transaction in each instance was incidental to permissive club operations.[9]

---

[9] As a reaffirmance of the views previously expressed in *Koon Kreek Klub* v. *Thomas*, petitioner cited *Texas Mobile Home Association* v. *Commissioner*, 324 F. 2d 691, which reversed a Memorandum Opinion of this Court denying a claim of exemption on the ground that contrary to the statute, net earnings of the association have inured to the benefit of its shareholders. The basis for the reversal was as an extensive quotation from the opinion of the Supreme Court in *Trinidad* v. *Sagrada Orden, supra*, in which case the Supreme Court specifically noted that it had been conceded that there had been no inurement of any part of the Sagrada Orden net earnings to the benefit of any stockholder or individual. And, no question as to the effect of an inurement of profits to a stockholder or individual was at issue or decided. It is true that *Koon Kreek Klub* v. *Thomas* was cited in the *Texas Mobile Home* opinion but only as a footnote to the statement that "many cases from this circuit and other circuits may be cited to the same effect" as the matter quoted from the Supreme Court's opinion in *Sagrada Orden*.

Aside from the fact that there was no discussion or interpretation of the statutory provision relating to the inurement of the net earnings of the organization, it is to be noted also that the *Texas Mobile Home Association* dealt with the question of exemption, not of a recreational club as in this case, but of a business league, and certainly it is not readily apparent that activities which might be regarded as incidental to the purposes of a business league would in any way be indicative of activities incidental to the purpose of a recreational club.

Contrary to the conclusions reached in the above-cited cases, the facts here show that the earnings in question were not from a related activity or from transactions incidental to regular club activities, but were activities which in disregard of the recreational purposes of Coastal Club's organization were entered into for the purpose of profit and that the profits realized did inure to the benefit of Coastal Club's private shareholders.

The facts show that since prior to 1936 the annual dues of Coastal Club have remained unchanged at $50 per member and from 1951 through 1963 have produced a total of $4,900 per year. For the same period the service and guest charges have ranged from a low of $1,359.50 in 1962 to a high of $5,114.50 in 1958. And the total receipts from dues plus service and guest charges during that period were never in any year as much as $9,000, except in 1958 when they reached the sum of $10,014.50 and 1959 when they amounted to $9,167.80. On the other hand, the total disbursements for the club maintenance, repairs, improvements, and operations were never less than $21,399.22, except for the years 1951 when they were $13,203.58, 1952 when they were $13,903.21, and 1953 when they were $16,591.27. For the other years they ranged to as high as $54,882.23 for 1958. It is thus apparent that for the years 1951 to 1963, which included the taxable years herein, oil and gas earnings and interest income on the accumulations thereof have been "applied * * * to the use or benefit" of the private members of the Coastal Club to an amount running as high as five times the total dues and charges paid to the club by its members. It goes without saying, we think, that these earnings realized through transactions with outsiders or nonmembers and without relation to club activities or use of club property for recreational purposes have inured to the benefit of the members of Coastal Club just as effectively as if cash distributions had been made and corresponding amounts collected from the members for club operations, including maintenance, repairs, and improvements. *Westside Tennis Club* v. *Commissioner*, *supra;* [10] *Jockey Club* v. *Helvering*, *supra; Aviation Club of Utah*, 7 T.C. 377, affd. 162 F. 2d 894.

To hold on facts such as we have here that petitioner's net earnings did not inure to the benefit of Coastal Club's members within the meaning of the statute would be to say that Congress in exempting recreational clubs from income tax intended to subsidize the recreational activities of private clubs at the expense of the revenue and of

---

[10] As distinguishing *Westside Tennis Club* v. *Commissioner* from this case petitioner points to the reference in the court's opinion to *Koon Kreek Klub*. The reference was not, however, related to the question of inurement of earnings to the benefit of the club members. Actually what the court said was, "It may also be that they could sell or lease a portion of their property which had been acquired for club purposes if the profits realized only constituted an incidental, trifling or non-recurrent contribution to income. Such was the situation in Santee Club v. White * * *; Koon Kreek Klub v. Thomas."

other taxpayers generally to the extent of the income tax on earnings from unrelated activities. On the statute here applicable we are unable to attribute any such intent to Congress. We accordingly conclude and hold that net earnings of petitioner for the years herein did, under the statute, inure to the benefit of Coastal Club members and that petitioner's claim of exemption must also fail for that reason.

The petitioner alleges in the alternative that the respondent in ruling that it was not exempt from tax under section 501(c)(7) for the years 1957 through 1960 and thus revoking the ruling of exemption of July 17, 1943, abused the discretion vested in him by section 7805(b) of the 1954 Code.[11] We are unable to see wherein this statute is in any respect applicable here. The facts show, as we have pointed out, that the activities at issue for the years herein were not only unrelated to petitioner's recreational activities but, in disregard thereof, were primarily for the purpose of profit and of such continuity and magnitude as to refute any contention that they were casual or incidental to the recreational activities for which Coastal Club was organized.

Furthermore, there is no evidence which is at all persuasive that the petitioner in the taxable years relied on the prior ruling to its detriment. To the contrary, petitioner was not only aware that by reason of its income-producing activities in 1957, its exemption under the prior ruling was in jeopardy, and this to the extent that it employed tax counsel to plan a method of distribution of its assets which would in the opinion of the attorney have the least tax consequences to the club and its members, but in adopting a wait-and-see course it relied quite heavily on the hope that respondent might not take a new look at its operations to the end that by reason of the returns it was filing as an exempt club, the statute of limitations would run on August 15 of each succeeding year on 1 more year of its operations.

As we read the section relied upon and the facts herein, there was not only no abuse of discretion but to the contrary a proper exercise of the discretion therein granted. *Stevens Bros. Foundation, Inc.*, 39 T.C. 93, affirmed on this issue 324 F. 2d 633. Compare *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180.

Petitioner's reliance on *H.S.D. Co.* v. *Kavanagh*, 191 F. 2d 831, and *Lesavoy Foundation* v. *Commissioner*, 238 F. 2d 589, is misplaced. In *H.S.D. Co.*, the court specifically held that the "reasons for which the pension trust had been retroactively revoked involved no new facts and no mistake of law but only different inferences from the same facts." Such was not the case here.

---

[11] SEC. 7805. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

With respect to *Lesavoy Foundation* v. *Commissioner*, it is to be noted that in the 1939 Code there was no provision comparable to 6501(g)(2) of the 1954 Code, which provides that if an organization determines in good faith that it is exempt, the filing of an information return on Form 990 will start the running of the 3-year statute of limitations for assessment of taxes pursuant to section 6501(a). *Lesavoy Foundation* did arise under the 1939 Code and there was a retroactive revocation pursuant to which a deficiency and additions to tax were determined which in amount exceeded the total assets of the foundation. The Court of Appeals held that the Commissioner had abused his discretion.

The situation here is altogether different. The effect of the provisions of section 6501(g)(2) is to provide the period within which the respondent is free to examine into and make determinations of the tax liability of organizations previously ruled to be exempt. In the instant case the respondent made his examination and his ruling of revocation of exemption and determined deficiencies within the time provided by the statute. We find no proper basis for the claim that in doing so he abused his discretion under any provisions of the Internal Revenue Code.

*Decision will be entered for the respondent.*